VILLAGE BOOKS, INC. ET AL. *v.* STATE OF
MARYLAND

[No. 12, September Term, 1974.]

*Decided August 7, 1974.*

The cause was argued before ORTH, C. J., and MOYLAN and LOWE, JJ.

*Stanley M. Dietz* for appellants.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County* and *John B. Wynes, Assistant State's Attorney for Prince George's County,* on the brief, for appellees.

ORTH, C. J., delivered the opinion of the Court.

The definition of obscenity originally announced by the Supreme Court of the United States in *Roth v. United States,* 354 U. S. 476, was significantly refined by the plurality opinion in *Memoirs v. Massachusetts,* 383 U. S. 413. Recognizing that the *Memoirs* plurality test for the determination of obscenity *vel non* had represented a sharp break with the test announced in *Roth,* the Court

reformulated the test in *Miller v. California,* 413 U. S. 15, and its siblings,[1] enunciating a constitutional test for obscenity to which a majority of the Court subscribed for the first time in a number of years. *Miller* made clear, however, 413 U. S. at 24, n. 6, that its decision was not intended to hold all state statutes dealing with obscenity inadequate, recognizing that existing statutes "as construed heretofore or hereafter may well be adequate", a recognition emphasized in *United States v. 12 200-ft. Reels of Film,* 413 U. S. 123. In *Ebert v. Maryland State Board of Censors,* 19 Md. App. 300, we construed, in the light of the *Miller* cases, the term "obscene" as used in Code, Art. 66A, subtitle "Moving Pictures", and particularly § 6 thereof, dealing with the duty of the Maryland State Board of Censors to disapprove films which are "obscene".[2] We found that material is within the constitutionally permissibly proscribed depictions in *Miller* when it:

> "(1) portrays sexual conduct in a patently offensive way in that it contains patently offensive:
>
> (a) representations or descriptions of ultimate sex acts, normal or perverted, actual or simulated; OR
>
> (b) representations or descriptions of masturbation, excretory functions, and lewd exhibitions of genitals; AND
>
> (2) taken as a whole:
>
> (a) would be found by the average person, applying contemporary community standards

---

1. *Paris Adult Theatre I v. Slaton,* 413 U. S. 49, *United States v. 12 200-ft. Reels of Film,* 413 U. S. 123, *United States v. Orito,* 413 U. S. 139, and *Kaplan v. California,* 413 U. S. 115, all decided 21 June 1973.

2. Section 6 (a) of the statute commands the Board to approve and license films which are "moral and proper" and to disapprove such "as are obscene, or such as tend, in the judgment of the Board, to debase or corrupt morals or incite to crimes." The criteria of a tendency to debase or corrupt morals and to incite to crime have heretofore been declared invalid on constitutional grounds by judicial decision. *Dunn v. Maryland State Board of Censors,* 240 Md. 249, 252-254. The only valid standard for disapproval of a film under the statute, therefore, is obscenity. *Sanza v. Maryland State Board of Censors,* 245 Md. 319, 338.

of the State, to appeal to the prurient interest in sex; AND

(b) does not have serious literary, artistic, political, or scientific value." 19 Md. App. at 314-315.

This appeal requires us to construe Code, Art. 27, § 418A, subtitle "Obscene Matter". That statute bestows upon the circuit courts of the counties and upon the equity courts of the Supreme Bench of Baltimore City the jurisdiction to enjoin the sale or distribution of any book, magazine, or other publication or article (including a motion picture film or showing) which is prohibited from sale or distribution. The State's attorneys of the county or Baltimore City in which a person sells or distributes, is about to sell or distribute, or has or is about to acquire possession with such intent, any such material which is obscene within the meaning of § 418 of Art. 27, may maintain an action for an injunction against such person. § 418A 1. Section 418 makes it a misdemeanor to knowingly send or cause to be sent, bring or cause to be brought, into Maryland for sale or distribution, or, in Maryland, to prepare, publish, print, exhibit, distribute, offer to distribute, "any obscene matter". We read "obscene" as it appears in § 418, and, thus, as it is used in § 418A, as we construed it in *Ebert* with respect to Code, Art. 66A, that is, within the parameters enunciated in the *Miller* complex of cases. Since *Ebert*, however, the Supreme Court, on 24 June 1974, decided two other cases concerning obscenity, *Hamling v. United States*, 418 U. S. 87, and *Jenkins v. Georgia*, 418 U. S. 153. We adopt, as applicable to Code, Art. 27, § 418 and § 418A, the definition and determination of obscenity set out in *Ebert*, as explicated, however, by *Hamling* and *Jenkins*.

What we did in *Ebert* with respect to Code, Art. 66A and what we do in this opinion with regard to Code, Art. 27, §§ 418 and 418A is to follow the dictates of the Supreme Court as to the basic guidelines for the trier of fact under the reformulated test for the determination of obscenity announced in *Miller*. Those guidelines must be:

"(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . .; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U. S., at 24.

With respect to (b), we have held that the statutes cover the sort of "patently offensive representations or description of that specific 'hard core' sexual conduct given as examples in *Miller v. California.*" With respect to (c), we rejected as constitutional standards, as did the Court in *Miller,* "the ambiguous concept of 'social importance' ", and the "utterly without redeeming social value" test. 413 U. S. at 25. With respect to (a), we now adopt the meaning of "contemporary community standards" as explicated in *Hamling* and *Jenkins.*

The Supreme Court has "a duty to authoritatively construe federal statutes where 'a serious doubt of constitutionality is raised' . . ." but must leave to state courts the construction of state legislation. *United States v. 12 200-ft. Reels of Film, supra,* at 130, no. 7. The Court indicated in that case that it was prepared to construe the generic terms in 18 U.S.C. § 1462 to be limited to the sort of "patently offensive representations or description of that specific 'hard core' sexual conduct given as examples in *Miller v. California.*" In *Hamling,* it so construed the companion provision in 18 U.S.C. § 1461. In so doing, the Court explicated in several areas the reformulated test announced in *Miller.* We note that the generic terms used in § 1461, dealing with mailing obscene matter, are "obscene, lewd, lascivious, indecent, filthy or vile" and that such terms used in § 1462, dealing with the importation or transportation of obscene matters, are "obscene, lewd, lascivious or filthy". These terms are not defined in the statutes, nor is the method of determining them set out.

## The Contemporary Community Standard

In *Hamling* it was contended that the standard in federal obscenity cases must be national ones and that the Court had not decided whether the Constitution requires the use of nationwide standards in federal obscenity prosecutions. The Court disagreed with those contentions. It said, 418 U. S. 87 at 104-105:

"We think that both of these contentions evidence a misunderstanding of our *Miller* holdings. *Miller* rejected the view that the First and Fourteenth Amendments require that the proscription of obscenity be based on uniform nationwide standards of what is obscene, describing such standards as 'hypothetical and unascertainable,' 413 U. S. at 31. But in so doing the Court did not require as a constitutional matter the substitution of some smaller geographical area into the same sort of formula; the test was stated in terms of the understanding of 'the average person, applying contemporary community standards.' 413 U. S. at 24. When this approach is coupled with the reaffirmation in *Paris Adult Theatre I v. Slaton*, 413 U. S. 49, 56 (1973), of the rule that the prosecution need not as a matter of constitutional law produce 'expert' witnesses to testify as to the obscenity of the materials, the import of the quoted language from *Miller* becomes clear. A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law. *Stone v. New York, Chicago & St. Louis R. Co.*, 344 U. S. 407, 409 (1953); *Schultz v. Pennsylvania R. Co.*, 350 U. S. 573, 525-526 (1956). Our holding in *Miller* that California could constitutionally proscribe

obscenity in terms of a 'statewide' standard did not mean that any such precise geographic area is required as a matter of constitutional law.

"Our analysis in *Miller* of the difficulty in formulating uniform national standards of obscenity, and our emphasis on the ability of the juror to ascertain the sense of the 'average person, applying contemporary community standards' without the benefit of expert evidence, clearly indicates that 18 U.S.C. § 1461 is not to be interpreted as requiring proof of the uniform national standards which were criticized in *Miller.*"

The Supreme Court has emphasized that a principal concern in requiring that a determination of obscenity *vel non* be made on the basis of "contemporary community standards" is to assure the material is judged neither on the basis of each juror's personal opinion, or by its effect on a particular sensitive person or group. *Miller* at 33; *Roth*, at 489-490; *Mishkin v. New York*, 383 U. S. 502, 508-509. So explained the Court: "The result of the *Miller* cases, therefore, as a matter of constitutional law and federal statutory construction, is to permit a juror sitting in obscenity cases to draw on knowledge of the community or vicinage from which he comes in deciding what conclusion 'the average person, applying contemporary community standards', would reach in a given case." *Hamling*, 418 U. S. 87, at 105. The Court, however, went further: "But this is not to say that a District Court would not be at liberty to admit evidence of standards existing in some place outside of this particular district, if it felt that such evidence would assist the jury in the resolution of the issues which they were to decide." *Id.* at 106.

In *Jenkins* the Court had before it the constitutionality of a state statute. Billy Jenkins was convicted, prior to *Miller* and its companion cases, of violating Georgia's obscenity statute for showing the film "Carnal Knowledge" in a motion picture theatre. The statute defined obscene material in terms of the *Memoirs* definition and the jury was instructed under it. The Georgia appellate court affirmed

the conviction. The Court said that its holding in *Miller* was "that it was constitutionally permissible to permit juries to rely on the understanding of the community from which they came as to contemporary community standards, and the States have considerable latitude in framing statutes under this element of the *Miller* decision. A State may choose to define an obscenity offense in terms of 'contemporary community standards' as defined in *Miller* without further specification, as was done here, or it may choose to define the standards in more precise geographic terms, as was done by California in *Miller*." *Jenkins*, 418 U. S. 153, at 157. That Georgia chose to define an obscenity offense in terms of contemporary community standards without further specification was accepted by the Supreme Court upon an implied judicial construction of the Georgia statute by the Georgia appellate court: "We agree with the Supreme Court of Georgia's implicit ruling that the Constitution does not require that juries be instructed in state obscenity cases to apply the standards of a hypothetical statewide community. *Miller* approved the use of such instructions; it did not mandate their use. What *Miller* makes clear is that state juries need not be instructed to apply 'national standards.' We also agree with the Supreme Court of Georgia's implicit approval of the trial court's instructions directing jurors to apply 'community standards' without specifying what 'community'." *Ibid.*

We construe Code, Art. 27, § 418 and, therefore, § 418A, as permitting the trier of fact to determine obscenity *vel non* by applying "community standards" without specifying what "community."

*Expert Testimony*

The *Miller* cases made abundantly clear that expert testimony is not necessary to enable the trier of fact to judge the obscenity of material which has been placed into evidence. See *Paris Adult Theatre I v. Slaton, supra,* at 56: *Kaplan v. California, supra,* at 120-121; *Ebert v. Maryland State Board of Censors, supra,* at 307-308. The ability of the juror to ascertain the sense of the "average person, applying

contemporary community standards" without the benefit of expert evidence was emphasized in *Miller.* This rule was expressly affirmed in *Hamling.* "Expert testimony is not necessary to enable the jury to judge the obscenity of material which . . . has been placed into evidence." *Hamling,* 418 U. S. 87, at 100. "The jury was not bound to accept the opinion of any expert in weighing the evidence of obscenity . . . ." *Id.* See *Jenkins,* 418 U. S. at 159-160.

## *The Function of the Trier of Fact and the Appellate Court*

In *Jenkins* there was little to be found in the record about the allegedly obscene film other than the film itself. Georgia contended that under *Miller* the obscenity *vel non* of the film was a question for the jury, and the jury having resolved the question against Jenkins, and there being some evidence to support its findings, the judgment of conviction should be affirmed. The Court pointed out that the questions of what appeals to the "prurient interest" and what is "patently offensive" under the *Miller* obscenity test are "essentially questions of fact." *Miller,* at 30. The Court made clear, however, that it did not agree that a jury's verdict that material is obscene virtually precludes all further appellate review that such material is protected by the First and Fourteenth Amendments. "Even though questions of appeal to the 'prurient interest' or of patent offensiveness are 'essentially questions of fact', it would be a serious misreading of *Miller* to conclude that juries have unbridled discretion in determining what is 'patently offensive.' Not only did we there say that 'the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary,' 413 U. S., at 25, but we made it plain that under that holding 'no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct. . . .' 413 U. S., at 27." 15 Cr. L. at 3261. Triers of fact, in finding material obscene, must

observe "substantive constitutional limitations, deriving from the First Amendment . . . ." *Idem.* The examples [3] of patent offensiveness given in *Miller,* while not purporting to be an exhaustive catalog of what juries might find to be patently offensive, "certainly intend to fix" such limitations. Mr. Justice Brennan summed it up neatly in his opinion concurring in the result in *Jenkins:*

> "After the Court's decision today, there can be no doubt that *Miller* requires appellate courts — including this Court — to review independently the constitutional fact of obscenity. Moreover, the Court's task is not limited to reviewing a jury finding under part (c) of the *Miller* test that 'the work, taken as a whole, lack[ed] serious literary, artistic, political, or scientific value.' *Miller* also requires independent review of a jury's determination under part (b) of the *Miller* test that 'the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law." 418 U. S. at 163-164.

## THE INSTANT CASE

On 16 November 1973 the Circuit Court for Prince George's County, upon application of the State's Attorney, and after hearing, issued an order under the authority of Code, Art. 27, § 418A permanently enjoining Village Books, Inc., Gary Wahl, Dennis E. Pryba, and Leroy Eichhorn "from the sale

---

**3.** The examples included " 'representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated,' " and " 'representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.' " 413 U. S., at 25. The Court in *Jenkins* commented, 15 Cr. L. at 3261: "It would be wholly at odds with this aspect of *Miller* to uphold an obscenity conviction based upon a defendant's depiction of a woman with a bare midriff, even though a properly charged jury unanimously agreed on a verdict of guilty." The Court, upon its own view of the film in *Jenkins* was satisfied that it could not be found under the *Miller* standards to depict sexual conduct in a patently offensive way, nothing in the movie falling within either of the two examples in *Miller,* nor there being anything sufficiently similar to such material to justify similar treatment. *Ibid.*

or further sale or the distribution or further distribution or the acquisition, publication or possession within this State" of 24 designated publications. It further ordered that a Special Investigator of the State's Attorney's Office seize and destroy the publications and all copies of them and that the respondents surrender all copies of the publications possessed by them within this State. Village Books, Inc. and Wahl appealed.

The application for injunctive relief alleged that on 25 June 1973 Lonnie Brown, a Special Investigator of the State's Attorney's Office purchased from Village Books, Inc., 4807 Allentown Road, Camp Springs, Maryland, 5 books "depicting patently offensive representations or descriptions of ultimate sexual acts, normal and perverted, and patently offensive representations or descriptions of masturbation, excretory functions, and the genitals". While on the premises Brown saw numerous other publications, similar to those he purchased, which were exhibited and offered for sale to the public. On 27 June, under the authority of a search and seizure warrant, he seized one copy each of a large number of such publications found on the premises. The premises were occupied by Village Books, Inc., Wahl was president of the corporation, Eichhorn was the cashier, and deliveries to the premises of materials offered for sale were made by Pryba. On 19 October 1973 Village Books, Inc., Pryba and Eichhorn filed a motion to suppress from use in evidence all the items seized "while executing a search warrant which was unlawful and illegal in violation of the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States of America and in violation of Article 23 and 26 of the Declaration of Rights of the State of Maryland." The same day the "defendants" filed a motion to dismiss the Bill of Complaint for an injunction on the ground that Code, Art. 27, §§ 417, 418 and 418A were unconstitutional. Upon hearing on 30 October both motions were denied. Upon hearing on 15 November on the merits of the Bill of Complaint the injunctive relief sought was granted.

## I

Appellants first ask: "Was the Search Warrant unconstitutionally overbroad in allowing unlimited discretion to the officers executing the warrant to pick and choose the items to be seized? "

The warrant commanded Brown, with the necessary and proper assistants to search 4807 Allentown Road "for the property specified, to wit: statues, figures, articles, films, photographs, books, publications, recordings, and other items depicting obscene matter and being exhibited and/or offered for sale and including all such statues or other figures or equipment, and one copy of all such books, films, photographs, recordings, and publications containing patently offensive representations or descriptions of ultimate sex acts, normal or perverted, actual or simulated, and patently offensive representations or descriptions of masturbation, excretory functions and lewd exhibitions of the genitals and if the property be found there to seize it and to seize any property found liable to seizure under the laws of this State. . . ."

At the hearing on the motion to suppress, it appeared that some 750 items were seized under the authority of the warrant — "approximately 750 copies of different magazines, pocket books, paperbacks, newspapers, tape recordings, comic books, dildos, french ticklers, et cetera." Evidence proffered by the State tended to show that only those items were seized which were probably obscene, and then only one of each kind, and if there was only one of an apparently obscene item it was not taken.

The nub of appellants' argument on the question, as we understand it, is that "determination by police officers of the status of the material, whether it is to be classified as obscene or not obscene, is not enough protection to satisfy the mandates of the First and Fourth Amendments." They assert: "We cannot permit unfettered discretion in seizures pursuant to overly broad warrants. The right to seize, in a free society, requires the sensitive determination of obscenity to be made judicially and not *ad hoc* by police officers in the field."

We think the answer to appellants' argument is found in *Hamling*. In that case the sufficiency of the indictment was attacked. The indictment charged an offense in the statutory language of 18 U.S.C. § 1461, which as we have indicated, spoke in terms of "obscene", "lewd", and similar generic terms. The Court in *Roth* had held that the language of § 1461 was not "too vague to support conviction for crime", 345 U. S. at 480. *Hamling* observed: "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.' " 418 U. S. at 117, citing *United States v. Carll*, 105 U. S. 611, 612. See *Hagner v. United States*, 285 U. S. 427; *United States v. Debrow*, 346 U. S. 374. The Court held that the word "obscene" met this test. "The definition of obscenity, however, is not a question of fact, but one of law; the word 'obscene', as used in 18 U.S.C. § 1461, is not merely a generic or descriptive term, but a legal term of art. . . . The legal definition of obscenity does not change with each indictment; it is a term sufficiently definite in legal meaning to give a defendant notice of the charge against him." 418 U. S. at 118.

Under this concept of "obscene" we think it patent that commanding the seizure of "obscene matter" does not allow "unlimited discretion to the officers executing the warrant to pick and choose the items to be seized." We conclude that the warrant here was not constitutionally overbroad.

We see nothing in *Heller v. New York*, 413 U. S. 483 to compel a contrary conclusion. Nor was there a massive search and seizure in the circumstances here as would put the seizure within the ambit of *Marcus v. Search Warrant*, 367 U. S. 717, *Stanford v. Texas*, 379 U. S. 476, or *A Quantity of Books v. Kansas*, 378 U. S. 205. And *Roaden v. Kentucky*, 413 U. S. 496 is simply not factually apposite.

We hold that the court below did not err in denying the motion to suppress the evidence.

## II

Appellants next ask: "Was the application of the ruling of *Ebert v. Maryland State Board of Censors,* an *ex post facto* denial of due process of law to the Appellants?"

At the hearing on the merits of the Bill for injunctive relief the trial court applying the *Miller* test adopted by *Ebert* found the material at issue to be obscene and, therefore, without the ambit of the First Amendment.

The Constitution of the United States forbids the Congress [4] and the States [5] to pass any ex post facto law. The Declaration of Rights to the Constitution of Maryland imposes a similar limitation on the legislature of Maryland.[6] The short answer to appellants' contention is that the proceeding here was civil. The constitutional prohibitions are not applicable to civil proceedings, but to legislation pertaining to criminal offenses. An ex post facto law within the contemplation of the constitutional prohibitions is one which, in its operation, makes that criminal which was not so at the time the action was performed, or which increases the punishment, or, in short, which, in relation to the offense and its consequences, alters the situation of a party to his disadvantage. Clark & Marshall, *A Treatise on the Law of Crimes* (7th Ed.) § 1.06, pp. 37-42. See, Perkins, *Criminal Law* (2nd Ed.), p. 9; 1 *Wharton's Criminal Law and Procedure* (1957) § 20; *Hochheimer's Criminal Law* (1st Ed.), § 66; *Black's Law Dictionary* (4th Ed.) "ex post facto law", and cases therein cited. As for the Maryland constitutional prohibition see *Braverman v. Bar Association,* 209 Md. 328; *Bannister v. Bannister,* 181 Md. 177; *Diamond Match Co. v. State Tax Commission,* 175 Md. 234; *Elliott v. Elliott,* 38 Md. 357; *Harrison v. State,* 22 Md. 468.

---

4. "No . . . ex post facto Law shall be passed." Constitution of the United States, Art. I, § 9.

5. "No state shall . . . pass any . . . ex post facto Law . . . ." Constitution of the United States, Art. 1, § 10.

6. The People declared "That retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal, are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required." Art. 17, Declaration of Rights, Constitution of Maryland.

We observe, however, that in *Hamling,* despite the many significant questions regarding the definition and determination of obscenity which it answered, the Court deemed the principal question presented by the case to be "what rules of law shall govern obscenity convictions had prior to the date on which this Court's decision in *Miller v. California, supra,* and its companion cases were handed down, but which had not at that point become final." 418 U. S., at 98. The Court in *Jenkins* said that what was held in *Hamling* was that "defendants convicted prior to the announcement of our *Miller* decisions but whose convictions were on direct appeal at that time should receive any benefit available to them from those decisions." 418 U. S. at 155. It seems in both *Hamling* and *Jenkins,* that although the convictions were prior to the *Miller* decisions, the Supreme Court resolved each appeal in the light of the *Miller* decisions. Further, *Village Books, Inc., et al. v. State's Attorney for Prince George's County,* 263 Md. 76, concerned, as does the case here, an injunction under the authority of Code, Art. 27, § 418A. It was issued by the Circuit Court for Prince George's County in early 1971. The Court of Appeals affirmed the order of the lower court in part upon determining, upon its independent constitutional appraisal, that certain material was hard core pornography, applying the *Memoirs* test. Upon certiorari the Supreme Court reversed and, by its mandate of 25 July 1973, remanded the case to the Court of Appeals of Maryland for further consideration in the light of the *Miller* decisions and *Heller v. New York, supra, Roaden v. Kentucky, supra,* and *Alexander v. Virginia,* 413 U. S. 836. By its order of 10 October 1973 the Court of Appeals asserted that it had so reconsidered its opinion and judgment. It found simply that they should be reaffirmed and ordered that its judgment "entered on October 13, 1971 ... be, and it is hereby reinstated and reaffirmed." *Village Books, Inc., et al. v. State's Attorney for Prince George's County,* 269 Md. 748. Here the determination of obscenity by the lower court in the first instance was in the light of the *Miller* decisions as adopted by *Ebert.* Under the rationale of the Supreme Court in its remand of *Village Books, Inc., et al. v. State's Attorney*

*for Prince George's County,* 263 Md. 76, and the subsequent action of the Court of Appeals, we see no violation of due process of law.

## III

Appellants thirdly ask: "In an obscenity-*per se* proceeding, is the State required to introduce expert testimony to rebut that offered by the Appellants, that the questioned literary materials would not appeal to a prurient interest and did contain serious literary, scientific and social value?" The answer is now clear. As we have indicated, expert testimony is not necessary to enable the trier of fact to judge the obscenity of material which has been placed in evidence. Nor is the trier of fact bound to accept the opinion of any expert in weighing the evidence of obscenity.

## IV

Appellants lastly ask: "Are the twenty-four (24) books and magazines constitutionally protected?"

By agreement only 24 publications of the items seized were offered in evidence. The appellants' expert witness, Dr. Leonard Rothstein,[7] placed the exhibits in four categories: (1) 12 paperback pocket books, not illustrated and supposedly fictional; (2) 7 magazines containing photographs, drawings and written material; (3) 3 publications, non-fiction, containing numerous photographs, both color and black and white; (4) 2 comic books. Following the *Miller* guidelines, the court found that "all twenty-four exhibits are obscene under the new definition."

We have reviewed independently the constitutional fact of obscenity. We find that each of the publications depicts and describes sexual conduct in a patently offensive way in that it contains patently offensive representations and descriptions of ultimate sex acts, normal and perverted, actual and simulated, and of masturbation and of lewd

---

7. Dr. Rothstein testified that he had been a doctor of medicine for 26 years with 25 years training and experience in psychiatry. The State stipulated that he was qualified "to testify as an expert witness in this case."

exhibitions of genitals. We find further that, taken as a whole, none of the publications has serious literary, artistic, political, or scientific value, and that the average person applying contemporary standards of the community or vicinage would find each of them to appeal to the prurient interest in sex. In oral argument before us counsel for appellants referred to the publications as "garbage." That is a fair characterization as far as it goes. They are fulsome and noisome, and more to the point, they are hard core pornography, screaming for all to hear that they are obscene. See *Village Books, Inc., et al. v. State's Attorney for Prince George's County*, 263 Md. 76, 85-86; *Donnenberg, et al. v. State*, 1 Md. App. 591, 600; *Levin v. State*, 1 Md. App. 139, 144-146. As long as material may be legally beyond the pale of the First and Fourteenth Amendments, these publications must be denied constitutional protection.

On our viewing and reading of the publications here placed in evidence, we hold that each of them could, as a matter of constitutional law, be determined to be outside the protection of the First and Fourteenth Amendments because it is obscene. We, therefore, agree with the findings of the court below and affirm its order.

> *Order of 16 November 1973 affirmed; costs to be paid by appellants.*